# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Doğukan Günaydın,

      Petitioner,

v.

Donald J. Trump, *in his official capacity as President of the United States*; Joel Brott, *in his official capacity as the Sherburne County Sheriff*; Peter Berg, *in his official capacity as the St. Paul Field Office Director for U.S. Immigration and Customs Enforcement*; Jamie Holt, *in her official capacity as Homeland Security Investigations St. Paul Special Agent in Charge, U.S. Immigration and Customs Enforcement*; Todd Lyons, *in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement*; Kristi Noem, *in her official capacity as Secretary of the United States Department of Homeland Security*; and Marco Rubio, *in his official capacity as Secretary of State*,

      Respondents.

File No. 25-CV-01151 (JMB/DLM)

**ORDER**

---

Hannah Brown, HB Law and Advocacy, Wayzata, MN, for Petitioner Doğukan Günaydın.

Friedrich A. P. Siekert and Ana H. Voss, United States Attorney's Office, Minneapolis, MN, for Respondents Donald J. Trump, Joel Brott, Peter Berg, Jamie Holt, Todd Lyons, Kristi Noem, and Marco Rubio.

---

This matter is before the Court on Petitioner Doğukan Günaydın's Motion for a Temporary Restraining Order (TRO) against Respondents Donald J. Trump, Joel Brott, Peter Berg, Jamie Holt, Todd Lyons, Kristi Noem, and Marco Rubio (together,

1

Respondents).   (Doc. No. 24.)   Günaydın asks the Court to enter a TRO to enjoin Respondents from continuing to detain him and, in the alternative, from transferring him to a location outside of the District.   In addition, Günaydın requests an order requiring Respondents reinstate his student status on his Student and Exchange Visitor Information System (SEVIS) record.   For the reasons explained below, the Court grants the motion in part and denies the motion in part at this time.

## BACKGROUND

Günaydın is a citizen of Türkiye who has resided in the United States since January 2022, when he was lawfully admitted on an F-1 visa.  (Doc. No. 11-1 at 1, 2.)  Until his arrest on March 27, 2025, Günaydın was a full-time and high-performing MBA student at the Carlson School of Management at the University of Minnesota.  (Doc. No. 26-1 [hereinafter "Günaydın Decl."] ¶¶ 1, 4, 14.)  He has one prior criminal conviction stemming from an offense on June 24, 2023.  (Doc. No. 11-2 at 4.)  Specifically, on March 13, 2024, in Minnesota state court, Günaydın pleaded guilty to and was sentenced for Third-Degree DWI, a gross misdemeanor.  (*Id.* ¶ 3; Doc. No. 11-2 at 1.)  A sentence of 180 days was imposed, but execution of that sentence was stayed for two years, and Günaydın was placed on probation.  (Doc. No. 11-2 at 1–2.)

On the morning of March 27, 2025, while on his way to class, plainclothes Immigration and Customs Enforcement (ICE) officers approached Günaydın without warning and forced him in an unmarked vehicle.  (Doc. No. 16 ¶ 4; Günaydın Decl. ¶ 7.) He feared he had been kidnapped.  (Günaydın Decl. ¶ 7.)  Günaydın was not told the reason for his arrest at the time of the arrest or for several hours afterward, but he was eventually

informed by officials that they detained him because his F-1 visa had been revoked. (*Id.* ¶¶ 8–11.) Unbeknownst to Günaydın, four days prior to his arrest, the State Department issued a "Memo for ICE," in which it "approved revocation, effective immediately, of the F-1 visa" issued to Günaydın because of the DWI conviction from March 13, 2024. (Doc. No. 11-3.) The State Department made the revocation of the F-1 visa "silent" and did not inform Günaydın of it "due to ongoing ICE operational security."[1] (Doc. No. 11-2.)

That same afternoon, also hours after his arrest, a "DHS Official" made an entry on Günaydın's SEVIS record, which showed that his student status had been terminated on two statutory grounds: INA § 237(a)(1)(C)(i) (permitting deportation of persons who fail to maintain their nonimmigrant status) "and/or" INA § 237(a)(4)(C)(i) (permitting deportation of persons "whose presence of activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States"). (Doc. No. 1-1.)

At some point after his arrest, Günaydın was presented with, but was not given a copy of, a Notice to Appear, which stated that DHS had initiated removal proceedings against him on the following grounds:

> You were admitted to the United States at Chicago, IL on or

---

[1] Contrary to this initial explanation for Günaydın's detention, Respondents subsequently conceded that the F-1 visa expired in 2022. (Doc. No. 16 ¶¶ 9–10.) More specifically, on April 4, 2025, several days after Günaydın's arrest and several days after Respondents informed Günaydın that he had been detained because his F-1 visa was revoked, the Bureau of Consular Affairs Visa Office sent him a non-descript email "on behalf of the Department of State." (Doc. No. 15-1.) Günaydın could not view this email when it was sent because he was detained without access to email. Nevertheless, the email informed Günaydın that the State Department had actually revoked his "B1/B2 nonimmigrant tourist visa." (*Id.*)

> about January 13, 2022 as a F-1 Student nonimmigrant.
>
> You have failed to maintain your status, to wit: in 2025 the United States State Department retroactively revoked the F-1 student visa based on your criminal history.[2]

(Doc. Nos. 11-4, 11-5.) This notice charged Günaydın under § 237(a)(1)(C)(i), for allegedly failing to maintain lawful non-immigrant status. (Doc. No. 11-5 at 1.) An initial hearing before an immigration judge (IJ) was set for April 8, 2025. (*Id.*)

Then, the day before his initial hearing, Günaydın learned that Respondents changed the basis for his detention and alleged removability. Instead of failing to maintain his status under § 237(a)(1)(C)(i) and instead of posing a serious threat to foreign policy under § 237(a)(4)(C)(i), Respondents now sought to remove Günaydın under INA § 237(a)(4)(A)(ii) (permitting deportation of persons who engaged in "criminal activity which endangers public safety or national security").

On April 11, 2025, the IJ conducted a hearing pursuant to *Matter of Joseph*, 22 I&N Dec. 799 (BIA 1999), which permits an IJ to determine whether the removal proceedings against Günaydın are "properly included" in a mandatory-detention category. Under *Matter of Joseph*, proceedings are "properly included" in a mandatory-detention category unless the person subject to removal can show that the Government is "substantially unlikely" to establish the charge of removability that would otherwise subject him to mandatory detention. *Id.* at 802–03, 806. At the *Joseph* hearing in this case, counsel for

---

[2] Again, as noted above, Respondents subsequently conceded that the F-1 visa expired in 2022. (Doc. No. 16 ¶¶ 9–10.) There is no explanation why Respondents initially and repeatedly referred to a revocation of an expired visa.

DHS indicated that the charge against Günaydın under § 237(a)(1)(C)(i) was being withdrawn, leaving § 237(a)(4)(A)(ii) as the only remaining basis for removal proceedings.[3] (Doc. No. 15-5.) The IJ ultimately agreed with Günaydın, concluding that he had shown that the Government was substantially unlikely to establish the charge of removability. As a result, the IJ issued a written order releasing Günaydın on $5,000 bond. (Doc. No. 22-1 at 7.) The IJ reasoned that because Günaydın completed his sentence, sold his vehicle, had his driving privileges revoked, took responsibility for the offense, complied with conditions of probation, and acquired strong community ties, Günaydın does not pose a present danger to persons or property and is not a flight risk. (Doc. No. 22-1 at 3–7.) DHS appealed this determination to the Board of Immigration Appeals (BIA). (Doc. No. 22-3.) While that appeal is pending, Günaydın remains detained due to the operation of the automatic-stay provision in 8 C.F.R. § 1003.19(i). Removal proceedings will resume with the IJ on May 6, 2025. (Doc. No. 26-2 ¶ 11.)

During the month he has been detained, Günaydın has been unable to continue his studies and has fallen behind. (Günaydın Decl. ¶ 17.) He fears that his continued detention will result in his "los[ing] everything [he] ha[s] worked so hard for since [he] came to the U.S," including a prestigious summer internship he had secured before his detention. (*Id.* ¶¶ 16, 18.)

---

[3] Unfortunately, Respondent's position on this issue remained unclear until recently. Despite its representation during the *Joseph* hearing, a few days later, DHS seemed to un-withdraw its withdrawal of removability under § 237(a)(1)(C)(i). (Doc. No. 22-6; Doc. No. 26-2 ¶¶ 8, 9.) However, as of April 22, 2025, DHS's position is now clear and no longer equivocal: DHS has indeed withdrawn its previous charge under § 237(a)(1)(C)(i) and seeks to remove Günaydın only under § 237(a)(4)(A)(ii). (Doc. No. 26-3 at 2.)

## DISCUSSION

Günaydın now moves for emergency injunctive relief.  Specifically, he asks the Court to enjoin Respondents from continuing to detain him or from transferring him to a location outside of the District, and that Respondents reinstate his student status on this SEVIS record.  The Court first declines to order the temporary injunction as proposed given the precise basis for Günaydın's continued detention and the limits of habeas relief. Nevertheless, at this time, the Court enjoins Respondents from moving Günaydın out of the District pending a hearing on the proposed TRO.

### A.    Relief Requested Beyond Habeas

The writ of habeas corpus functions to grant a petitioner relief from unlawful custody or imprisonment, *see, e.g.*, 28 U.S.C. § 2241, and a habeas petitioner may only challenge the fact or duration of their confinement.  *Spencer v. Haynes*, 774 F.3d 467 (8th Cir. 2014); *see also Kruger v. Erickson*, 77 F.3d 1071, 1073–74 (8th Cir. 1996) (discussing scope of relief under habeas is limited to fact or duration of present confinement and that civil rights actions provide vehicle for relief from other unlawful treatment); *Pierre v. United States*, 525 F.2d 933, 935–36 (5th Cir. 1976) (providing that habeas corpus "cannot be utilized as a base for the review of a refusal to grant collateral administrative relief or as a springboard to adjudicate matters foreign to the question of the legality of custody"). Given the nature of habeas relief, the Court declines to grant two aspects of the TRO.

First, the Court declines to order Respondents to reinstate Günaydın's student status because the termination of his student status is no longer related to his current detention. The Court acknowledges that, when ICE first took Günaydın into custody, his detention

6

was based on allegations that he had failed to maintain his nonimmigrant status under

§ 237(a)(1)(C)(i).  At that time, Günaydın's student status had a clear link to the fact or

duration of his detention, and the restoration of his student status may have been within the

purview of habeas relief available to him.  However, superseding events have broken this

link.[4]  Specifically, since April 7, 2025, Günaydın has been charged with being removeable

under  § 237(a)(4)(A)(ii),  and DHS ultimately confirmed that all prior charges of

removability have been withdrawn.  The restoration of his student status at this time would

have no impact or relation to the fact or duration of his detention.  Thus, the Court will not

consider this request for relief.

    Likewise, the Court declines to grant Günaydın's request for immediate release

from detention.  The IJ ordered Günaydın to be released on bond.  Günaydın makes no

challenge to this decision.  Because he prevailed in his arguments to the IJ, Günaydın is

currently detained only by operation of the automatic-stay provision set forth in 8 C.F.R.

§ 1003.19(i).  Importantly, although Günaydın challenges the lawfulness of his initial arrest

and the detention from March 27 through April 7, 2025, Günaydın makes no argument

specifically challenging the constitutionality of 8 C.F.R. § 1003.19(i).  Absent a well-

developed argument concerning the regulation that is the current basis for Günaydın's

detention, the Court declines to consider ordering his release at this time.

---

[4] Nothing in this Order precludes Günaydın from bringing an independent action under the
Administrative Procedures Act challenging the termination of his student status, and
nothing in this Order should be construed as relating to the merits of such a claim.

B.      **Remaining Requests for Relief**

The Court is left with Günaydın's request that he not be transferred or otherwise moved out of the District while his habeas petition is pending. For the following reasons, the Court grants the request at this time.

When considering a motion for a TRO, courts consider the following four familiar factors: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981); *see also Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) ("[T]he standard for analyzing a motion for a temporary restraining order is the same as a motion for preliminary injunction."). No one factor is determinative and courts "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (quotation omitted). The central question is whether justice requires preserving the status quo until the merits are determined. *See Dataphase*, 640 F.2d at 113. The moving party bears the burden to establish these factors. *E.g.*, *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

Here, the record before the Court at this time indicates that Respondents have provided inconsistent justifications for Günaydın's detention and arrest. Given the uncertainty in these proceedings to date, justice requires keeping Günaydın in this District until the merits of his underlying habeas action can be determined. If Respondents transfer

Günaydın out of the District of Minnesota, Günaydın will suffer irreparable harm: he may

lose access to counsel, the Court may lose jurisdiction over the custodial Respondents, and

Günaydın may no longer be able to participate in litigation.  These are injuries that are

concrete and imminent and that cannot be remedied after they occur.

By comparison, there is no indication that Respondents will experience any harm

from an order prohibiting his transfer out of the District.  *Hoque v. Trump, et al.*, No. 25-

CV-1576 (JWB/DTS), Doc. No. 15 (D. Minn. Apr. 22, 2025) (temporarily enjoining

respondents from transfer out of district while habeas petition was pending); *see also*

*Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022) ("[T]he equities strongly favor an

injunction considering the irreversible impact [the challenged agency] action would have

as compared to the lack of harm an injunction would presently impose.").  Further, given

the determination by the IJ that Günaydın poses no danger to the community and is not a

flight risk (Doc. No. 22-1 at 6–7), at this time Respondents cannot justify relocating

Günaydın based on any security interest.  Respondents' potential interest in relocating

Günaydın is outweighed by the strong public interest favoring enforcement of

constitutional safeguards.  *See, e.g.*, *Phelps-Roper*, 545 F.3d at 690 (acknowledging that

"it is always in the public interest to protect constitutional rights"); *R.I.L.R. v. Johnson*, 80

F. Supp. 3d 164, 191 (D.D.C. 2015) ("The public interest is served when administrative

agencies comply with their obligations under the APA.").  Preserving Günaydın's access

to judicial review and preventing unlawful detention are compelling issues of public

importance.  Therefore, the Court grants Günaydın motion in part at this time and prohibits

Respondents from transferring him outside of this District until further order of the Court.[5]

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT Petitioner Doğukan Günaydın's Motion for a

Temporary Restraining Order (Doc. No. 24) is GRANTED in part, and DENIED in part,

as follows:

1.    Respondents shall not remove, transfer, or otherwise facilitate the removal of Günaydın from the District of Minnesota.

2.    No other person or agency shall remove, transfer, or otherwise facilitate the removal of Günaydın from the District of Minnesota on Respondent's behalf.

3.    The Court DENIES the remaining requested injunctive relief.

4.    This Order is effectively immediately and shall expire fourteen days after the date of entry unless Günaydın shows good cause for its extension.

5.    Respondents shall file a response to Plaintiff's Motion for a Temporary Restraining Order (Doc. No. 24) by or before **May 5, 2025**.  Günaydın may file a reply by or before **May 8, 2025**.  The Court will conduct a hearing on **Monday, May 12, 2025, at 3:00 PM** in Courtroom 3A in St. Paul before Judge Jeffrey M. Bryan.


Dated:  April 28, 2025                                    /s/ *Jeffrey M. Bryan*
                                                              Judge Jeffrey M. Bryan
                                                              United States District Court

---

[5] The Court determines that a bond under Federal Rule of Civil Procedure 65(c) is not necessary because the TRO seeks to prevent constitutional deprivations and because Respondents face no identifiable risk of monetary loss.  A bond is also not necessary because this matter is closely associated with important public interests.  *See, e.g.*, *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016).