## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Doğukan Günaydın,

        Petitioner,

v.

Donald J. Trump, *in his official capacity as President of the United States*; Joel Brott, *in his official capacity as the Sherburne County Sheriff*; Peter Berg, *in his official capacity as the St. Paul Field Office Director for U.S. Immigration and Customs Enforcement*; Jamie Holt, *in her official capacity as Homeland Security Investigations St. Paul Special Agent in Charge, U.S. Immigration and Customs Enforcement*; Todd Lyons, *in his official capacity as Acting Director, U.S. Immigration and Customs Enforcement*; Kristi Noem, *in her official capacity as Secretary of the United States Department of Homeland Security*; and Marco Rubio, *in his official capacity as Secretary of State*,

        Respondents.

File No. 25-CV-01151 (JMB/DLM)

**ORDER**

---

Hannah Brown, HB Law and Advocacy, Wayzata, MN; Kelsey Hines, Hines Immigration Law, PLLC, Roseville, MN, for Petitioner Doğukan Günaydın.

Friedrich A. P. Siekert and Ana H. Voss, United States Attorney's Office, Minneapolis, MN, for Respondents Donald J. Trump, Joel Brott, Peter Berg, Jamie Holt, Todd Lyons, Kristi Noem, and Marco Rubio.

---

     This matter is before the Court on Petitioner Doğukan Günaydın's Second Amended

Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 (Petition) against Respondents

Donald J. Trump, Joel Brott, Peter Berg, Jamie Holt, Todd Lyons, Kristi Noem, and Marco Rubio (together, Respondents).  For the reasons stated below, the Court grants the Petition.

## BACKGROUND

### A.    Findings of Fact Concerning Günaydın's Arrest and Initial Detention

Günaydın is a citizen of Türkiye who has resided in the United States since January 2022, when he was lawfully admitted on an F-1 visa.  (Doc. No. 11-1 at 1, 2.)  Until his arrest on March 27, 2025, Günaydın was a full-time and high-performing MBA student at the Carlson School of Management at the University of Minnesota.  (Doc. No. 26-1 ¶¶ 1, 4, 14.)  He has one prior criminal conviction for an offense on June 24, 2023.  (Doc. No. 11-2 at 1.)  He pleaded guilty to and was sentenced for Third-Degree DWI, a gross misdemeanor.  (*Id*.)  The state court imposed a sentence of 180 days but stayed execution of the sentence and placed Günaydın on probation.  (*Id.* at 1–2.)

On the morning of March 27, 2025, while on his way to class, plainclothes Immigration and Customs Enforcement (ICE) officers approached Günaydın without warning and forced him into an unmarked vehicle.  (Doc. No. 26-1 ¶ 7.)  He feared he had been kidnapped.  (*Id.*)  At the time of his arrest, ICE officials informed Günaydın that they had arrested him because his "F-1 visa is retroactively revoked."[1]  (Doc. No. 37-1 ¶ 60.)

---

[1] Unbeknownst to Günaydın, four days prior to his arrest, the State Department issued a "Memo for ICE," in which it "approved revocation, effective immediately, of the F-1 visa" issued to Günaydın because of the DWI conviction from March 13, 2024.  (Doc. No. 11-3.)  The State Department made the revocation of the F-1 visa "silent" and did not inform Günaydın of it "due to ongoing ICE operational security."  (Doc. No. 11-3.)  Respondents subsequently conceded that the F-1 visa expired in 2022.  (Doc. No. 16 ¶¶ 9–10.)  More specifically, on April 4, 2025, several days after Günaydın's arrest and several days after

Günaydın expressed his confusion to the ICE officials and attempted to explain to them that an F-1 visa is merely a travel document, whereas his student status is what determined his lawful presence in the country. (*Id.*) Once at the ICE office at Fort Snelling, ICE officers outwardly expressed confusion about the basis for removability. (*Id.* ¶ 61.)

That same afternoon, also hours after his arrest, an official from the Department of Homeland Security (DHS) made an entry on Günaydın's Student and Exchange Visitor Information System record, which showed that his student status had been terminated on two statutory grounds: section 237(a)(1)(C)(i) of the Immigration and Nationality Act (INA) (permitting deportation of persons who fail to maintain their nonimmigrant status) "and/or" section 237(a)(4)(C)(i) of the INA (permitting deportation of persons "whose presence of activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States"). (Doc. No. 1-1.)

At some point after his arrest, Günaydın was presented with, but was not given a copy of, a Notice to Appear, which stated that DHS had initiated removal proceedings against him on the following grounds:

> You were admitted to the United States at Chicago, IL on or about January 13, 2022 as a F-1 Student nonimmigrant.

---

Respondents informed Günaydın that he had been detained because his F-1 visa was revoked, the Bureau of Consular Affairs Visa Office sent him a non-descript email "[o]n behalf of the United States Department of State." (Doc. No. 15-1.) Günaydın could not view this email when it was sent because he was detained without access to email. Nevertheless, the email informed Günaydın that the State Department had actually revoked his "B1/B2 nonimmigrant tourist visa." (*Id.*)

> You have failed to maintain your status, to wit: in 2025 the
> United States State Department retroactively revoked the F-1
> student visa based on your criminal history.[2]

(Doc. Nos. 11-4, 11-5.) This notice charged Günaydın under § 237(a)(1)(C)(i), for

allegedly failing to maintain lawful non-immigrant status. (Doc. No. 11-5 at 1.) An initial

hearing before Immigration Judge Sarah Mazzie was set for April 8, 2025. (*Id.*)

Then, the day before his initial hearing, Günaydın learned that Respondents changed

the basis for his detention and alleged removability. Instead of failing to maintain his status

under § 237(a)(1)(C)(i) and instead of posing a serious threat to foreign policy under

§ 237(a)(4)(C)(i), Respondents now sought to remove Günaydın under INA

§ 237(a)(4)(A)(ii) (permitting deportation of persons who engaged in "criminal activity

which endangers public safety or national security"). Respondents provided no

explanation for this abrupt change.

On April 11, 2025, the Immigration Judge conducted a hearing pursuant to *Matter

of Joseph*, 22 I&N Dec. 799 (BIA 1999), which permits an immigration judge to determine

whether the removal proceedings are "properly included" in a mandatory-detention

category. Under *Matter of Joseph*, proceedings are "properly included" in a mandatory-

detention category unless the person subject to removal can show that DHS is

"substantially unlikely" to establish the charge of removability that would otherwise

subject him to mandatory detention. *Id.* at 802–03, 806. At the *Joseph* hearing in this case,

---

[2] Again, as noted above, Respondents subsequently conceded that the F-1 visa expired in
2022. (Doc. No. 16 ¶¶ 9–10.) There is no explanation why Respondents initially and
repeatedly referred to a revocation of an expired visa.

counsel for DHS indicated that the charge against Günaydın under § 237(a)(1)(C)(i) was being withdrawn, leaving § 237(a)(4)(A)(ii) as the only remaining basis for removal proceedings.[3]  (Doc. No. 22-1 at 2.)  The Immigration Judge ultimately agreed with Günaydın, concluding that he had shown that DHS was substantially unlikely to establish the charge of removability.  As a result, the Immigration Judge issued a written order releasing Günaydın on $5,000 bond.  (*Id.* at 7.)  The Immigration Judge reasoned that release on bond was appropriate because Günaydın completed his sentence, sold his vehicle, had his driving privileges revoked, took responsibility for the offense, complied with conditions of probation, and acquired strong community ties.  (*Id.* at 3–7.)  She further reasoned that Günaydın's chemical dependency evaluation reflected that his "drunk driving arrest was an isolated incident," and that he had "taken responsibility for drinking and driving," "scored very low in all risk categories," "d[id] not fit criteria for abuse of dependence," and did not "require treatment."  (*Id.* at 6–7.)  The Immigration Judge thus concluded that Günaydın does not pose a present danger to persons or property and is not a flight risk.  (*Id.* at 3–7.)  DHS immediately appealed this determination to the Board of Immigration Appeals (BIA).  (Doc. No. 22-2; Doc. No. 22-3; Doc. No. 29 ¶ 4.)  Briefing to the BIA on the issue of detention and bond has been complete since May 8, 2025.  (Doc.

---

[3] Unfortunately, Respondents' position on this issue remained unclear until recently. Despite its representation during the *Joseph* hearing, a few days later, DHS seemed to un-withdraw its withdrawal of removability under § 237(a)(1)(C)(i).  (Doc. No. 22-6; Doc. No. 26-2 ¶¶ 8, 9.)  However, as of April 22, 2025, DHS's position became clearer and no longer equivocal: DHS has indeed withdrawn its previous charge under § 237(a)(1)(C)(i) and seeks to remove Günaydın only under § 237(a)(4)(A)(ii).  (Doc. No. 26-3 at 2.)

No. 29 ¶ 9.)[4]  Günaydın remains detained while the bond appeal is pending due to the operation of the automatic stay provision in 8 C.F.R. § 1003.19(i)(2).

Then, on April 30, 2025, the Immigration Judge issued a written decision on the merits of the removal proceedings.  (Doc. No. 29 ¶ 7; Doc. No. 29-5.)  The Immigration Judge dismissed the charge of removability against Günaydın and terminated his removal proceedings.  (Doc. No. 29-5 at 5.)  In doing so, she determined that DHS had not shown by clear and convincing evidence that Günaydın was removable because while Günaydın had "engaged in dangerous activity" when he committed his DWI offense, the evidence did not show that he had "placed a large segment of the general population at risk."  (*Id.* at 4.)  In support of her conclusion that Günaydın "did not pose an imminent or substantial risk to person or property," she found that there were no restaurants, bars, pedestrians, or additional motorists in the vicinity of Günaydın's route, Günaydın traveled at a "normal pace," and police followed Günaydın "for seven blocks before stopping him."  (*Id.*)  Based on this evidence, she concluded that Günaydın's DWI offense fell outside the narrow scope of criminal conduct that would render an individual removable under § 237(a)(4)(A)(ii).[5] (*Id.*)  DHS immediately appealed the removability decision to the BIA.  (Doc. No. 29 ¶ 8; Doc. No. 6.)

---

[4] In their Return, Respondents do not assert that Günaydın poses a threat to national security, endangers public safety, poses a flight risk, or is otherwise a poor candidate for bond.  (*See* Doc. No. 39.)

[5] In their Return, Respondents do not suggest that Immigration Judge erred in her findings or conclusion that DHS had not established the charge of removability under INA § 237(a)(4)(A)(ii) by clear and convincing evidence.  (*See* Doc. No. 39.)

In a sworn affidavit, Günaydın describes the "dehumanizing experience" of remaining in detention at a county jail after having prevailed in immigration court—including lack of access to the outdoors, physical activity, clean jumpsuits, and privacy—which has brought him to the point of feeling "mentally and emotionally exhausted" and "sub-human."  (Doc. No. 33-1 ¶¶ 28–49.)  During the nearly two months he has been detained, Günaydın has been unable to continue his studies, for which he took out $40,000 in loans, and has fallen behind in his degree.  (Doc. No. 26-1 ¶ 17; Doc. No. 37-1 ¶¶ 12, 14, 104.)  He continues to pay rent on an apartment in which he can no longer reside.  (Doc. No. 37 ¶ 102.)  He fears that his continued detention will result in his "los[ing] everything [he] ha[s] worked so hard for since [he] came to the U.S.," including a prestigious summer internship he had secured before his detention and opportunities for post-graduation employment.  (*Id.* ¶¶ 16, 18; Doc. No. 37-1 ¶¶ 18–20.)

## B.    Development and Implementation of the Automatic Stay Regulation

Section 236(a) of the INA (codified as 8 U.S.C. § 1226(a)) confers discretion to the Attorney General and DHS to make decisions in some circumstances as to the detention and bond of persons charged with removal actions based on criminal activity while they await removal decisions.[6]  The Act grants individuals detained pursuant to 8 U.S.C. § 1226(a) the right to seek review of the initial custody determination before an immigration judge at any time.  8 U.S.C. §§ 1226(a)(1), (c)(1), (c)(4); 8 C.F.R.

---

[6] The statute refers only to the Attorney General.  However, the Homeland Security Act of 2002 transferred many immigration enforcement and administrative functions to the Secretary of Homeland Security.  *See* Pub. L. No. 107-296, 116 Stat. 2135 (2002).

§ 1003.19(a). If an immigration judge finds that a detainee is eligible for bond, DHS may appeal the decision of the immigration judge to the BIA. 8 C.F.R. § 1003.19(f). The regulations also provide DHS the unilateral authority to stay the immigration judge's bond order and keep the person who was granted bond detained pending DHS's appeal to the BIA. *See* 8 C.F.R. § 1003.19(i)(2).

A brief history of this automatic stay provision is helpful to the Court's decision today. Prior to 2001, detainees subject to discretionary detention under 8 U.S.C. § 1226(a) who were then granted bond by an immigration judge remained detained only if the BIA granted a request to stay the bond order. *See, e.g.*, 8 C.F.R. § 3.19(i)(2) (1998) (permitting the use of automatic stays only where the noncitizen was subject to a mandatory detention statute). On October 31, 2001, following the terrorist attacks of September 11, the Immigration and Naturalization Service (INS)—an agency whose functions now fall under DHS's purview—implemented an interim rule to expand its authority to issue automatic stays to prevent the effectuation of immigration judges' custody decisions pending their appeal. *See Executive Office for Immigration Review; Review of Custody Determination*, 66 Fed. Reg. 54909, 54910 (Oct. 31, 2001). For circumstances in which the INS was previously was required to seek an emergency stay from the BIA to prevent the effectuation of an immigration judge's order for release on bond, the new rule allowed the INS to unilaterally invoke an emergency stay at its own discretion to prevent the detainee's release. *Id.* Notes pursuant to publication in the Federal Register explained that this revision would "allow the Service to maintain the status quo while it seeks review by the Board, and thereby avoid the necessity for a case-by-case determination of whether a stay

should be granted[.]" *Id.*  The INS emphasized that the stay was "a limited measure," to be used only "where the Service determines that it is necessary to invoke the special stay procedure pending appeal." *Id.*

This new interim rule took effect without first permitting public comment.  Due in part to the "detention of a large number of individuals" as a result of "the current investigation in connection with recent terrorist activities," Attorney General John Ashcroft determined that "the delays inherent in the regular notice-and-comment process would be 'impracticable, unnecessary and contrary to the public interest.'" *Id.* at 54911.

The new automatic stay regulation raised due process concerns from its inception. For instance, although the rule was in place on an interim basis, the agency permitted a sixty-day public comment period for the purposes of developing a final rule, and the agency received nearly unanimous criticism of the interim rule on due process grounds.  *See Executive Office for Immigration Review; Review of Custody Determination*, 71 Fed. Reg. 57873, 57876 (Oct. 2, 2006).  Of the six public comments, five commentators expressed strong opposition, arguing that the rule violated the Fifth Amendment's Due Process Clause.  *Id.*  The sixth commentator wrote in support of the rule, arguing in part that the availability of habeas review in federal district court would guarantee that the person subject to the rule could receive judicial review of the agency's unilateral decision.  *Id.*  In addition, a former General Counsel of INS, David Martin, provided testimony in 2003 to the National Commission on Terrorist Attacks in which he voiced his concern regarding the agency's use of automatic stays.  *See* David A. Martin, *Preventive Detention: Immigration Law Lessons for the Enemy Combatant Debate, Testimony Before the*

*National Commission on Terrorist Attacks Upon the United States, December 8, 2003*, 18 Geo. Immigr. L.J. 305 (2004). He stated that "there are indications that the automatic stay mechanism is now being used routinely and without careful calculation by the enforcement agencies of the individual merits that led the [immigration judge] to reduce the bond in the first place." *Id.* at 313. Martin expressed concern that, while the interim rule was initially passed in conjunction with anti-terrorism national security efforts, the automatic stay provision was being used to detain non-violent offenders based on "old criminal convictions of persons who have lived law-abiding lives since finishing their sentences." *Id.* He urged the agency to repeal the automatic stay provision and revert to the old process of seeking emergency stays from the BIA, which, he believed, would provide "sufficient safeguards, both of public safety and of the core interest in liberty." *Id.*

During this same period, several federal district courts concluded that the automatic stay provision violated the due process rights of detainees. In *Ashley v. Ridge*, 288 F. Supp. 2d 662, 673 (D.N.J. 2003), for example, the District of New Jersey vacated the automatic stay on a detained noncitizen's petition for a writ of habeas corpus, finding that "the continued detention of Petitioner without judicial review of the automatic stay of the bail determination, despite the Immigration Judge's decision that he be released on bond, violates Petitioner's procedural and substantive due process constitutional rights." *Id.* at 675. Likewise, in *Bezmen v. Ashcroft*, 245 F. Supp. 2d 446 (D. Conn. 2003), another habeas action, the District of Connecticut dissolved the automatic stay, finding that the government's stated goal of preventing the release of noncitizens posing a threat to national security or the public was not adequately served by the petitioner's ongoing detention and

10

was outweighed by the petitioner's Fifth Amendment right to be free from governmental detention. *Id.* at 450–51. Federal courts in California and Michigan reached the same conclusion. *See, e.g.*, *Zabadi v. Chertoff*, No. 05-CV-1796 (WHA), 2005 WL 1514122 (N.D. Cal. June 17, 2005) (finding the automatic stay provision unconstitutional); *Zavala v. Ridge*, 310 F. Supp. 2d 1071 (N.D. Cal. 2004) (same); *Uritsky v. Ridge*, 286 F. Supp. 2d 842 (E.D. Mich. 2003) (same).

In 2006, the Department of Justice promulgated its final rule. *See Executive Office for Immigration Review; Review of Custody Determination*, 71 Fed. Reg. 57873 (Oct. 2, 2006). The final rule included the language of the interim rule, with some notable changes. First, "to allay possible concerns that in some case the automatic stay might be invoked . . . without an adequate factual or legal basis," the final rule added a requirement that the decision to invoke an automatic stay must be made by the Secretary of DHS, and a senior legal official at DHS must certify that sufficient factual and legal bases exist to justify the continued detention. *Id.* at 57876. Second, the final rule imposed some time limitations. The final rule provides that DHS's order of automatic stay will lapse ninety days after the filing of the notice of appeal if the BIA has not acted on the custody appeal. 8 C.F.R. § 1003.6(c)(4) (2006). However, DHS may seek an additional discretionary stay from the BIA to prevent lapse; to do so, DHS would submit a motion to the BIA asking for a discretionary stay pending the BIA's decision on the custody appeal. In this case, the automatic stay would remain in place for up to thirty additional days to permit the BIA time to rule on the motion. 8 C.F.R. § 1003.6(c)(5). If the BIA denies the discretionary stay, fails to act upon it within the requisite period, or issues a decision upholding the

immigration judge's custody ruling, then the automatic stay would remain in place for an additional five business days to permit the Secretary or a designated DHS official to decide whether to refer the decision for the Attorney General's review. 8 C.F.R. § 1003.6(d). If the agency decides to refer, then the automatic stay would remain in place for an additional fifteen business days to permit the Attorney General time to consider the merits of the referred decision and decide whether to act on the referred decision. *Id.*

## DISCUSSION

In his Petition, Günaydın argues for his immediate release on grounds that the regulation that keeps him detained—the automatic stay provision at 8 C.F.R. § 1003.19(i)(2)—violates his due process rights under the Fifth Amendment to the U.S. Constitution. Because Respondents advance no argument to justify the challenged regulation as invoked in this case and because those procedures do not satisfy the test for procedural due process, the Court grants the Petition.[7]

---

[7] Because the Court grants the Petition on due process grounds, the Court need not reach Günaydın's second claim: that the automatic stay provision exceeds the authority delegated to DHS by Congress. Given the recent developments in the law surrounding agency rulemaking, the Court expresses its concern that agency officials have exceeded the authority delegated to the agency by Congress. Section 1226(a) grants the Attorney General—and DHS by statutory extension—the authority to make discretionary decisions regarding the detention of some classes of noncitizens. It is not clear that this statute grants a single agency official the authority to override the order of the immigration judge, who is also a delegee of the Attorney General, particularly in instances such as here, in which the removal proceedings against the aggrieved noncitizen have been terminated. *See Zadvydas*, 533 U.S. at 699 (concluding that "once removal is no longer reasonably foreseeable, continued detention [of noncitizens charged with removal proceedings] is no longer authorized by statute"); *see also Zabadi*, 2005 WL 1514122, at *1 (holding the automatic stay regulation *ultra vires* as it "eliminates the discretionary authority of immigration judges to determine whether an individual may be released, thereby exceeding

## I.    LEGAL STANDARDS[8]

The Constitution guarantees that the writ of habeas corpus is "available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const., Art. I, § 9, cl. 2).  For most of the nation's history, habeas review "has remained a critical check on the Executive, ensuring that it does not detain individuals except in accordance with law." *Id.* (quotation omitted).

The Constitution also guarantees every person in the United States due process of law, including persons who are not United States citizens.  *E.g.*, *Lopez v. Heinauer*, 332 F.3d 507, 512 (8th Cir. 2003) ("The Supreme Court has long recognized that deportable aliens are entitled to constitutional protections of due process." (citing *Yamataya v. Fisher*, 189 U.S. 86, 100–01 (1903))); *see also, e.g.*, *Trump v. J.G.G.*, 604 U. S. ___, ___, 145 S. Ct. 1003, 1006 (2025) (*per curiam*) ("'It is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings." (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993))); *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001) ("[T]he

_____

the authority bestowed upon [the agency] by Congress"); *Zavala*, 310 F. Supp. 2d at 1079 (finding the automatic stay regulation *ultra vires* because it "effectively eliminates the discretionary nature of the immigration judge's determination and results in a mandatory detention . . . of a new class of aliens, although Congress has specified that such individuals are not subject to mandatory detention").  This is especially true where the same agency officials who have unilaterally invoked the automatic stay provision were themselves parties appearing in the adversarial process before the immigration judge and who have presented changing and inconsistent explanations concerning the basis for the removal proceedings at issue.

[8] The parties do not dispute the propriety of habeas proceedings to challenge the regulation at issue.  They also make no argument that the Constitution does not guarantee Günaydın the right to habeas review or the protections of the Due Process Clause of the Fifth Amendment.

Due Process Clause applies to all persons within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.").

To determine whether a civil detention violates a detainee's due process rights, courts apply the familiar three-part test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022) (collecting cases and noting that, "when considering due process challenges to [discretionary noncitizen detention] other circuits . . . have applied the *Mathews* test"); *see also Hernandez-Lara v. Lyons*, 10 F.4th 19, 27 (1st Cir. 2021) (applying *Mathews* test to § 1226(a) challenge); *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020) (same). Pursuant to *Mathews*, courts weigh the following three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

As a threshold matter, the Court observes that Respondents develop no argument concerning the particular procedural question presented by the Petition: whether a regulation can permit an agency official to unilaterally detain a person after a judge has ordered the person's release and after a judge has dismissed the underlying proceedings. Respondents' written submission instead relies on cases involving unrelated and dissimilar procedures, such as the continued detention of persons against whom an immigration judge has issued a final order of removal, *Zadvydas*, 533 U.S. at 683, persons who have been

ordered detained or held under a high bond by an immigration judge, *Miranda v. Garland*, 34 F.4th 338, 347 (4th Cir. 2022); *Ali v. Brott*, 770 F. App'x 298, 299 (8th Cir. 2019), and persons who have committed crimes expressly listed in a mandatory detention statute or who did not prevail at (or did not even request) a *Joseph* hearing. *Nielsen v. Preap*, 586 U.S. 392, 395 (2019); *Demore v. Kim*, 538 U.S. 510, 513–14 (2003); *Banyee v. Garland*, 115 F.4th 928, 930 (8th Cir. 2024).

Rather than justifying Günaydın's detention, Respondents' inapposite cases highlight the distinctiveness of Günaydın's circumstances and tend to support his legal arguments accordingly. Indeed, Respondents cite cases that rely on the opportunity for an adversarial hearing, including a *Joseph* hearing, to justify the constitutionality of continued detention in the face of a due process challenge. *See Jennings v. Rodriguez*, 583 U.S. 281, 289 n.1 (2018) (noting that "[a]nyone who believes that he is not covered by [the mandatory detention statute] may also ask for what is known as a '*Joseph* hearing'"); *Demore*, 538 U.S. at 514 n.3 (noting that *Joseph* hearings are "immediately provided" to any detainee who requests one); *Reno*, 507 U.S. at 309 (noting that juvenile detainees "may request a judicial redetermination at any time later in the deportation process"). Respondents go on to argue that, based on these cases, no due process violation has occurred because the Immigration Judge held a *Joseph* hearing. (Doc. No. 39 at 7 (stating that the *Joseph* hearing "afforded Günaydın ample due process" and "properly accounted for Günaydın's individual liberty interests"); *id.* at 22 (characterizing the *Joseph* hearing as "more due process than that to which [Günaydın] was entitled").) The question presented, however, is not whether the opportunity for a *Joseph* hearing satisfies the

*Mathews* factors. The question presented is whether the challenged regulation—one that permits one party in the adversarial process to unilaterally override the outcome of a *Joseph* hearing—passes the *Mathews* test. In this way, Respondents' argument rings hollow, for it relies on the availability of a *Joseph* hearing, which its own regulation renders meaningless.

Here, Günaydın not only availed himself of these procedural safeguards, he also prevailed before the Immigration Judge at the *Joseph* hearing and again on the merits of the underlying removal action. (*See* Doc. No. 22-1 (ordering Günaydın's release on bond); Doc. No. 29-4 (concluding that DHS has not established removability and ordering removal proceedings be terminated).) Because of the Immigration Judge's two decisions in his favor, Günaydın presents a much stronger case than the petitioners in the cases on which Respondents rely. Respondents cite to no case, and they develop no argument, involving the propriety of the continued detention of a person who has been ordered released by an immigration judge and whose underlying proceedings have been dismissed on the merits by an immigration judge. The Court cannot overlook the important distinguishing features of this case.

In short, the absence of any argument from Respondents regarding the particular procedures followed in this case is sufficient and independent grounds for granting the Petition. Nevertheless, the Court alternatively conducts a due process analysis under the factors set forth in *Mathews*.

## II.    *MATHEWS* FACTORS

### A.    Private Interest

The first *Mathews* factor requires consideration of the private interest affected by Respondents' invocation of the automatic stay provision.  The Court concludes that this factor weighs heavily in Günaydın's favor for three reasons.

First, Günaydın has a significant interest at stake; being free from physical detention is "the most elemental of liberty interests." *Hamdi*, 542 U.S. at 529, 531 (directing courts, when assessing the first *Mathews* factor, to consider only the petitioner's interests at stake in ongoing detention without consideration of the respondents' justifications for the detention (quotation omitted)); *see also Zadvydas*, 533 U.S. at 690 (advising that an individual's interest in being free from detention "lies at the heart of the liberty that [the Due Process] Clause protects").

Second, the conditions of Günaydın's detention further tip this first factor in his favor.  When assessing this factor, courts consider the conditions under which detainees are currently held, including whether a detainee is held in conditions indistinguishable from criminal incarceration.  *See Hernandez-Lara*, 10 F.4th at 28 (involving noncitizen detainee held "alongside criminal inmates" at a county jail); *Velasco Lopez*, 978 F.3d at 852 (observing noncitizen was "not detained" but, rather, was incarcerated in conditions identical to those imposed on criminal defendants after being convicted of "violent felonies and other serious crimes").  Günaydın is and has been held at Sherburne County Jail, a facility that houses civil detainees in the immigration context, pre-trial criminal arrestees, and incarcerated prisoners serving criminal sentences.  He is experiencing all the

deprivations of incarceration, including loss of contact with friends and family, loss of income earning, interruptions to his education, lack of privacy, and, most fundamentally, the lack of freedom of movement.  (Doc. No. 37-1 ¶¶ 18–54, 83–89.)

Third, Günaydın has also identified other significant private interests affected, such as the completion of his academic semester, the possible forfeiture of a semester's tuition, the loss of privacy, the loss of a prestigious summer internship, and detrimental impacts on his post-graduation career prospects.  (*Id.* ¶¶ 12–13, 18.)

Thus, Günaydın has established that the first *Mathews* factor strongly favors granting the Petition.

## B.    Risk of Erroneous Deprivation

The second *Mathews* factor requires courts to assess whether the challenged procedure creates a risk of erroneous deprivation of individuals' private rights and the degree to which alternative procedures could ameliorate these risks.  Upon review, the Court concludes that § 1003.19(i)(2) creates a substantial risk of erroneous deprivation of a detainee's interest in being free from arbitrary confinement.  Therefore, this factor also favors granting the Petition.

First, the risk of deprivation is high because the only individuals adversely affected by this regulation are those detainees who have already prevailed in a judicial hearing.  The regulation only confers on agency officials the right to invoke an automatic stay and, presumably, agency officials would not act to stay favorable decisions.  Thus, the challenged regulation permits an agency official who is also a participant in the adversarial process to unilaterally override the immigration judge's decisions.  Such a rule is

anomalous in our legal system, and Respondents direct the Court to no other instance in any context in which a non-prevailing party is granted such authority. It represents a basic conflict of interest of which courts have disapproved in other contexts. *See, e.g.*, 5 U.S.C. § 554(d)(2) (prohibiting agency employees engaged in prosecuting functions from participating in the adjudicatory decision); *Marcello v. Bonds*, 349 U.S. 302, 305–06 (1955) (holding that the special inquiry officer adjudicating over an immigration case cannot also undertake the functions of prosecutor in the same matter). The Court also concurs with decisions from other jurisdictions concluding that a rule permitting the non-prevailing government party to stay a judgment permitting a detainee's release creates the risk of erroneous deprivation. *See Zavala*, 310 F. Supp. 2d at 1078 (noting that the automatic stay procedure "creates a potential for error because it conflates the functions of adjudicator and prosecutor"); *Ashley*, 288 F. Supp. 2d at 671 (concluding that the regulation creates a "patently unfair situation by taking the stay decision out of the hands of the judges altogether and giving it to the prosecutor who has by definition failed to persuade a judge in an adversary hearing that detention is justified" (quotation omitted)).

Second, the automatic stay regulation includes no requirement that the agency official invoking it consider any individualized or particularized facts, which increases the potential for erroneous deprivation of individuals' private rights. In the context of a bond order, the parties in immigration court contest whether the detainee poses a danger to the public and whether the detainee is a flight risk. *See Matter of Guerra*, 24 I&N Dec. 37 (BIA 2006). To obtain an order of release at a *Joseph* hearing, like Günaydın did, the detainee must establish that the agency is substantially unlikely to establish the charge of

removability.  *In re Joseph*, 802–03, 806.  The immigration judge making a detention decision and deciding the outcome of a *Joseph* hearing is required to tailor the decision to the individual and make a particularized assessment of the applicable factors.  However, an agency official invoking the automatic stay provision need not make *any* individualized or particularized justification for an action that results in the continued deprivation of liberty.

Third, the automatic stay regulation does not include any standards for the agency official to satisfy and operates as an appeal of right.  In this way, the regulation runs counter to the more typical process, in which a stay pending appeal is deemed "an extraordinary remedy," *M.M.V. v. Barr*, 459 F. Supp. 3d 1, 4 (D.D.C. 2020), and "an intrusion into the ordinary processes of administration and judicial review," *Nken v. Holder*, 556 U.S. 418, 427 (2009) (quotation omitted), and is never awarded as "a matter of right." *Id.*  Moreover, a stay of an order directing the release of a detained individual is an "especially" extraordinary step, because "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).  To obtain a traditional stay on appeal, the party seeking the stay must satisfy a threshold standard by making a showing of likelihood of success on the merits, risk of irreparable injury, and the balance of interests.  *See Nken*, 556 U.S. at 434.  In this analysis, "the first two factors . . . are most critical." *Id.*  To be granted a stay on a court order, the party seeking the stay must make a strong showing that they are likely to ultimately prevail; in making this showing, "[i]t is not enough that the chance of success on the merits be

better than negligible."[9]  *Id.* (quotation omitted); *see also Hilton v. Braunskill*, 481 U.S. 770, 771 (1987) (noting that, in the habeas context, the Federal Rules of Appellate Procedure create "a presumption favoring release of a successful habeas petitioner pending appeal" which can only be overcome by a judge's "individualized judgments" on the traditional stay factors).  No such requirement is included in the automatic stay regulation. This turns these well-established procedural principles on their heads and carries a significant risk of erroneous deprivation.

As to the value of additional procedural safeguards, the regulation itself includes an obvious alternative—one that, as noted above, follows a more traditional process of requesting a stay from the appellate court.  Section 1003.19(i)(1) sets forth a procedure by which DHS may request an emergency stay of the immigration judge's custody determination from the BIA.  The BIA then conducts an expedited preliminary review to determine whether a stay is warranted based on the individual circumstances and merits of the case.  This process cures the due process infirmities of § 1003.19(i)(2) while preserving the government's interest in preventing an erroneous release.  *See Zavala*, 310 F. Supp. 2d at 1077 (concluding that 8 C.F.R. § 1003.19(i)(1) provides "an appropriate and less restrictive means whereby the government's interest in seeking a stay of the custody

---

[9] In her bond order following the *Joseph* hearing, the Immigration Judge determined that DHS was "substantially unlikely" to prevail on the only charge it pursued against Günaydın.  (Doc. No. 22-1 at 5.)  In light of this finding, the Court is skeptical that DHS would prevail on the *Nken* factors.

redetermination may be protected without unduly infringing upon Petitioner's liberty interest"); *see also Bezmen*, 245 F. Supp. 2d at 451 (reaching same conclusion).[10]

The Court therefore finds that the second *Mathews* factor supports Günaydın's claim that the automatic stay provision violates the Due Process Clause.

### C. Respondents' Competing Interest and Burdens of Additional or Substitute Procedural Requirements

The third step of the *Mathews* test directs the Court to weigh the private interests at stake and the risk of erroneous deprivation of those interests against Respondents' interests in persisting with the regulation, including the fiscal and administrative burdens of an additional or substitute procedural requirement. For the following reasons, the Court concludes that this factor also favors granting the Petition.

At the outset, the Court concludes that ensuring that persons subject to possible removal do not commit crimes or evade law enforcement during the pendency of their removal proceedings presents a significant governmental interest. However, in this case, Respondents make no argument that public safety or future court appearances require a

---

[10] Respondents argue that the current regulation has "corrected any perceived defects in the prior version." (Doc. No. 39 at 19.) The Court disagrees. The additional requirement identified by Respondents in the final rule (that the agency attorney certify the position is "warranted by existing law or by a non-frivolous argument," 8 C.F.R. § 1003.6(c)(1)(ii)) merely restates an attorney's existing ethical obligations. *See* ABA Model Rules of Prof. Conduct 3.1 (prohibiting the advancement of non-meritorious factual or legal positions). Further, the final version does include time limitations which were absent from the interim rule. *See* 8 C.F.R. § 1003.6(c)(4)–(5). However, for reasons detailed in Günaydın's Petition, the Court concludes that the present scheme still permits the essentially unreviewable detention of a noncitizen for lengthy periods of time, in excess of 120 days from the date of appeal. (*See* 8 C.F.R. § 1003.6(c)(5), (d); Doc. No. 37 ¶¶ 87–95.)

stay of the order releasing Günaydın. Rather, Respondents argue only that "mitigating flight risk and preventing danger to the community" are not "the only legitimate purposes for immigration detention." (Doc. No. 39 at 14.) Respondents expressly identify no other legitimate purpose served by Günaydın's ongoing detention. As a result, Günaydın argues that the Court must inquire "whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore*, 538 U.S. at 532–33 (Kennedy, J., concurring). The Court need not inquire into the motives—ulterior or otherwise—behind Respondents' invocation of the automatic stay provision, however, because existing statutory and regulatory safeguards adequately serve the governmental interest in promoting public safety.

As noted above, the current regulation also provides for a process through which DHS may request an emergency stay from the BIA pending appeal of an immigration judge's order. 8 C.F.R. § 1003.19(i)(1).[11] Respondents do not argue that they were unable to request a stay from the BIA or that doing so is burdensome. On its own, the Court identifies little, if any, additional burden that Respondents face if they were unable to invoke the automatic stay regulation which, as noted in its implementing regulations, is a

---

[11] The Court also observes that Congress has set forth a list of crimes under which detainees are subject to mandatory detention. *See* 8 U.S.C. § 1226(c). Congress could include additional offenses, even gross misdemeanors such as the one Günaydın committed two years ago. Such legislative does not create any discernable fiscal or administrative burden on Respondents.

rare and somewhat exceptional action in the first place.[12]   *See Executive Office for Immigration Review; Review of Custody Determination*, 66 Fed. Reg. 54909 (Oct. 31, 2001) (describing the automatic stay as a "limited measure").   Thus, given the absence of an argument to the contrary, and in light of the infrequent invocation of the automatic stay regulation, the Court is compelled to conclude that Respondents' interest in preserving the automatic stay regulation is almost entirely, if not entirely, reduced by the mechanisms already in place for requesting an emergency stay from the BIA.

In conclusion, all three *Mathews* factors favor Günaydın's position, and the Court concludes that the automatic stay regulation at § 1003.19(i)(2) violates Günaydın's procedural due process rights under the Fifth Amendment.   The Court therefore orders Günaydın's immediate release. [13]

---

[12] *See* Stacy L. Brustin, *A Civil Shame: The Failure to Protect Due Process in Discretionary Immigration Custody & Bond Redetermination Hearings*, 88 Brook. L. Rev. 163, 225 n.231 (2022) (providing data yielded from a DHS FOIA request showing considerable variance but revealing that, on average, DHS invoked an automatic stay twenty-six times per year over the last seven years).

[13] Günaydın also raises a substantive due process challenge to the automatic stay regulation. In light of its decision supra concerning the *Mathews* factors, the Court need not also analyze this independent substantive due process argument. Nevertheless, the Court is concerned that the automatic stay provision violates Günaydın's substantive due process rights, and Respondents advance no justification for Günaydın's ongoing detention past the termination of his removal proceedings.   Other district courts have found that the automatic stay provision also violates detainees' substantive due process rights. *See, e.g.*, *Kambo v. Poppell*, No. SA-07-CV-800-XR, 2007 WL 3051601, at *20 (W.D. Tex. Oct. 18, 2007); *Zavala*, 310 F. Supp. 2d at 1077; *Ashley*, 288 F. Supp. 2d at 669.

**ORDER**

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.    Petitioner Doğukan Günaydın's Second Amended Petition for Writ of Habeas Corpus (Doc. No. 37) is **GRANTED**.

2.    Petitioner shall be released from custody, immediately, subject to the conditions previously imposed by the Immigration Judge, including the $5,000 bond.

3.    By 4:00pm CST on May 22, 2025, Respondents shall file notice with the Court confirming Petitioner's release.

Dated:  May 21, 2025                              *s/Jeffrey M. Bryan*
                                                   Judge Jeffrey M. Bryan
                                                   United States District Court